**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **LOUISIANA MUNICIPAL RISK MANAGEMENT AGENCY, individually and on behalf of all those similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No. _____.** |
| **TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, HCFS HEALTH CARE FINANCIAL SERVICES, LLC, and ACS PRIMARY CARE PHYSICIANS LOUISIANA PC,** | ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff, the Louisiana Municipal Risk Management Agency ("LMRMA"), for its complaint against Defendants, Team Health Holdings, Inc., Ameriteam Services, LLC, HCFS Health Care Financial Services, LLC, and ACS Primary Care Physicians Louisiana PC (collectively "TeamHealth"), states as follows:

## I.     NATURE OF THE ACTION.

1.      Plaintiff administers a self-funded insurance plan to cover medical expenses of employees of police departments, fire departments, ambulance and other important local services. Like so many other self-funded plans, Plaintiff has faced ever-rising healthcare costs. Now, Plaintiff has learned, as alleged below, that a significant portion of these escalating healthcare costs is directly attributable to systematic overcharges by the TeamHealth organization whose doctors staff numerous emergency rooms of hospitals.

1

2.        This overbilling came as no accident, but rather was the fruit of a deliberate business model and carefully reticulated scheme developed by the TeamHealth organization.  The scheme makes the overbilling undetectable using traditional audit metrics. That is by design. As described below, TeamHealth has set up over 100 ostensibly separate provider entities across the nation, each seemingly independent and disconnected from the others.  In fact, though, they are all commonly controlled in a cartel-like manner.

3.        Nearly every facet of the interactions between healthcare providers and the patients, from the timing and selection of services to the words chosen to describe the healthcare services rendered, is impacted by the heavy-handed dictates of TeamHealth.  Once the medical records are created, the provider has no idea what will ultimately be charged for those services.   All of these provider entities, though, use a common TeamHealth coding and billing facility that facilitates false and fraudulent coding.  TeamHealth knows that by sending out the bills under the names of these many separate providers, and by obfuscating its fraud, it would be difficult if not impossible for anyone to spot the overbilling.

4.        It is now evident from multiple other lawsuits, including two before this Court, that the TeamHealth enterprise systematically overbilled both governmental and private insurance and self-funded payors.[1]  However, the Plaintiff and other similarly situated self-insured plans are not addressed in any of the prior or pending litigation on this issue.  Accordingly, Plaintiff now brings

_____

[1] See United States ex rel. Hernandez v. Team Fin., L.L.C., No. 2:16-CV-00432-JRG, 2020 U.S. Dist. LEXIS 26608, *4-12, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020) (summarizing analogous scheme); and Celtic Ins. Co. v. Team Health Holdings, Inc., No. 3:20-cv-00523-DCLC-HBG (E.D. Tenn.), ECF No. 1, complaint filed Dec. 10, 2020, ¶¶ 8-17 (same).  Plaintiffs do not seek to bring a claim for "balance billing" of individuals as alleged in Fraser v. Team Health Holdings, Inc., No. 20-cv-04600-JSW (N.D. Cal.), see Class Action Complaint dated July 10, 2020, ¶ 20 (balance billing action brought by "uninsured" individuals).

2

this action to recover damages reflecting the wrongful medical overbilling by the Defendants, on behalf of itself and a putative class of others similarly situated.

5.     As shown in detail below, TeamHealth is a private equity-owned management company headquartered in Tennessee that staffs many hospitals across the nation. Over the last several years, TeamHealth has engaged in a pattern and practice of health care overbilling[2] that has caused harm not only to the Medicare system, and to individual large private insurance payors, but also to self-funded health insurance plans such as Plaintiff's plan herein, and others that are similarly situated. This lawsuit is brought to recover damages, restitution, and injunctive relief to redress the Defendants' improper healthcare billing practices.

6.     During the four-year damages period applicable herein,[3] TeamHealth provided staffing, operation, and billing services to various hospital emergency departments ("EDs") as a

---

[2] *See United States ex rel. Hernandez v. Team Fin., L.L.C.*, No. 2:16-CV-00432-JRG, 2020 U.S. Dist. LEXIS 26608, *31, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020) (denying motion to dismiss relator's complaint filed under the False Claims Act, 31 U.S.C. § 3729 *et seq*. alleging upcoding and overbilling fraud); *Celtic Ins. Co. v. Team Health Holdings, Inc.*, No. 3:20-cv-00523-DCLC-HBG (E.D. Tenn.) (complaint filed Dec. 10, 2020 alleging *inter alia* systematic upcoding/overbilling); *Emergency Care Services of Pennsylvania v. UnitedHealth Group*, No. 5:20-cv-5094 (E.D. Pa.), *see* ECF No. 37 (counterclaim alleging that TeamHealth engaged in upcoding on health insurance claims); *United Healthcare Services, Inc. v. Team Health Holdings, Inc.*, No. 3:21-cv-00364 (E.D. Tenn.) (same, primary claim); *United States ex rel. Oughatiyan v. IPC the Hospitalist Co., Inc.*, No. 09-C-5418, 2015 U.S. Dist. LEXIS 19066, 2015 WL 718345 (N.D. Ill. Feb. 17, 2015) (denying in part motion to dismiss FCA claim of TeamHealth hospitalist overbilling); *U.S. ex rel. Mamalakis vs. Anesthetix Management LLC*, 2021 U.S. App. LEXIS 36193, 2021 WL 5818476 (Dec. 8, 2021) (involving TeamHealth anesthesiologist overbilling).
[3] For Counts One and Two, alleging claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, the statute of limitations is four years. *See Rotella v. Wood*, 528 U.S. 549, 553 (2000); *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 155-56 (1987); *Fraley v. Ohio Gallia County*, No. 97-3564, 1998 U.S. App. LEXIS 28078, *4 (6th Cir. Oct. 30, 1998); *Lehman v. Lucom*, 727 F.3d 1326, 1330-31 (11th Cir. 2013). For Count Three, unjust enrichment, a three-year period should apply. *See Moore v. Westgate Resorts Ltd., L.P.*, No. 3:18-CV-00410-DCLC, 2020 U.S. Dist. LEXIS 216516, *35-37, 2020 WL 6814666 (E.D. Tenn. Nov. 18, 2020); *Precision Tracking Sols., Inc. v. Spireon, Inc.*, No. 3:12-

contractor. TeamHealth promised to increase efficiency and profitability, in exchange for a share of earnings. In connection with its staffing, TeamHealth regularly rendered and renders healthcare services to enrollees of group medical plans such as the Plaintiff's self-funded plan herein. Over time, the enrollees received ED services from TeamHealth staff at various hospitals.

7. During the pertinent times, TeamHealth used a fraudulent and intentionally obfuscated scheme[4] in order to obtain overpayments from Plaintiff and other similarly situated payors. TeamHealth, using a centralized corporate billing "back office" facility in the organization, and following uniform rules, policies, practices, and procedures, systematically overbilled Plaintiff and other class members by using certain improperly chosen Current Procedural Terminology ("CPT") codes[5] in conjunction with the billing. Plaintiff and other class member plans relied on TeamHealth's representations in the form of the CT codes that it

_____

CV-00626-PLR, 2014 U.S. Dist. LEXIS 92255, *9-12, 2014 WL 3058396 (E.D. Tenn. July 7, 2014); *Carter v. Jackson-Madison County Hosp. Dist.*, No. 1:10-cv-01155-JDB-egb, 2011 U.S. Dist. LEXIS 157329, *5-11 (W.D. Tenn. Dec. 13, 2011); *Swett v. Binkley*, 104 S.W.3d 64, 67 (Tenn. Ct. App. 2002); *Keller v. Colgems-EMI Music, Inc.*, 924 S.W.2d 357, 359-61 (Tenn. Ct. App. 1996). Further, Plaintiff alleges that tolling applies insofar as the Defendants made active efforts to conceal their misconduct. *See In re Estate of Davis*, 308 S.W.3d 832, 840-42 (Tenn. 2010); *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 463 (Tenn. 2012).
[4] *See United States ex rel. Hernandez v. Team Fin., L.L.C.*, No. 2:16-CV-00432-JRG, 2020 U.S. Dist. LEXIS 26608, *4-12, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020) (summarizing analogous scheme); and *Celtic Ins. Co. v. Team Health Holdings, Inc.*, No. 3:20-cv-00523-DCLC-HBG (E.D. Tenn.), ECF No. 1, complaint filed Dec. 10, 2020, ¶¶ 8-17 (same). Plaintiffs do not seek to bring a claim for "balance billing" of individuals as alleged in *Fraser v. Team Health Holdings, Inc.*, No. 20-cv-04600-JSW (N.D. Cal.), *see* Class Action Complaint dated July 10, 2020, ¶ 20 (balance billing action brought by "uninsured" individuals).
[5] "CPT codes are developed, maintained, and copyrighted by the American Medical Association to help ensure uniformity among medical professionals and the health insurance industry. CPT codes consist of a group of numbers assigned to every task and service a medical practitioner may provide to a patient, including medical, surgical, and diagnostic services." *Witkin v. Bureau of Workers' Comp. Fee Review Hearing Office (State Workers' Ins. Fund)*, 67 A.3d 98, 99 n.4 (Pa. Commonwealth Ct. 2013).

transmitted across state lines and certified were "true, accurate and complete"[6] in accepting claims for payment to their detriment, paying higher rates than were properly due.

8. Private payors reimburse providers for higher CPT code services at a higher rate than for lower-coded services. TeamHealth billed using CPT codes appropriate for higher levels of care, when in fact such services were neither appropriate nor provided. Defendants systematically engaged in classic upcoding, that is, specifying a higher code than was appropriate, and submitted fraudulent billing to Plaintiff and numerous other private payors.

9. TeamHealth employed its scheme through its billing policies and practices to cause private self-funded plans to overpay. Through the duration of its scheme, TeamHealth fraudulently obtained monies to which it was not entitled from Plaintiff and other self-funded plans during the time period within the statute of limitations for which it employed the scheme.

10. During the pertinent times, administrators of self-funded plans, like insurers for fully funded plans, used similar rules to determine amounts to pay TeamHealth based on the CPT codes also used by the Centers for Medicare and Medicaid Services ("CMS") to pay under the Medicare program. TeamHealth's scheme violated the CMS rules and the rules used by self-funded plans, alike.

11. TeamHealth advertises that it controls its employed coders under uniform and comprehensive guidance. TeamHealth represents to the public that it carefully calibrates its compliance criteria and that it even audits the work performed by its coders. Given that fact, TeamHealth must have acted intentionally, or recklessly, in allowing the subject conduct to occur.

---

[6] CMS Form 1500, see preprinted statements on reverse side of the hardcopy version. The electronic version is deemed to include the same.

12.     TeamHealth perpetrated its schemes for the purpose of generating additional profit. The scheme defrauded the Plaintiff and similarly situated plans cumulatively of millions of dollars.

II.     **PARTIES.**

A.     **Plaintiff**.

13.     Plaintiff LMRMA is an entity organized and existing or properly licensed under Louisiana law and has an office address of 700 North 10th Street 400, Baton Rouge, LA 70802. Plaintiff is an interlocal risk management agency created pursuant to La. Rev. Stat. § 33:1341 *et seq*. Plaintiff has established and today administers a group self-insurance fund from contributions of its members in order to pool together workers' compensation risks.

B.     **Defendants**.

14.     Defendant Team Health Holdings, Inc. is a Delaware corporation with its principal place of business at 265 Brookview Centre Way, Suite 400, Knoxville, Tennessee 37919. For jurisdictional purposes it is a citizen of Delaware and Tennessee.  It may be served with process at its corporate office address or c/o its registered agent, Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312.  Team Health Holdings, Inc. is the ultimate parent company for the TeamHealth organization.  Upon information and belief, Team Health Holdings, Inc. was directly involved in promulgating and implementing the unlawful business policies and practices alleged herein.

15.     Defendant Ameriteam Services, LLC ("Ameriteam") is a Tennessee limited liability company.  Its sole member is Team Finance LLC, whose sole member is Team Health Holdings, Inc. On information and belief, AmeriTeam employs executive officers of TeamHealth; issues policies that govern all TeamHealth entities in conjunction with its ultimate parent, Team

6

Health Holdings, Inc.; and provides operational direction and administrative support to all TeamHealth entities. Its principal place of business is at the 265 Brookview Centre Way address. AmeriTeam is a citizen of Delaware and Tennessee. It may be served with process at its corporate office address or c/o its registered agent, Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312.

16. Defendant HCFS Health Care Financial Services, LLC is a Florida limited liability company with a principal office situated in Knoxville, Tennessee. It may be served at its principal office address at 265 Brookview Centre Way, Suite 400, ATTN: Legal Dept., Knoxville, TN 37919-4049; or via its registered agent, Corporation Service Company, 2626 Glenwood Avenue, Suite 550, Raleigh NC 27608. On information and belief, the sole member of HCFS Health Care Financial Services, LLC is Team Radiology, LLC, the sole member of Team Radiology, LLC is Team Finance LLC, and the sole member of Team Finance LLC is Team Health Holdings, Inc. HCFS Health Care Financial Services, LLC provides billing, coding, and collection services for the TeamHealth enterprise, as well as for others.

17. Defendant ACS Primary Care Physicians Louisiana PC is a business entity on information and belief formed and organized under Louisiana law. It is an emergency medicine provider. Its NPI Number is 1306889092. It has an office address at 211 4th Street, Alexandria, LA 71301 and an office address at PO Box 634703, Cincinnati, OH 45263. Its provider tax ID number is 62-1859672. This entity is ultimately owned by Team Health Holdings, Inc. It may be served at its addresses above or c/o its registered agent, Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, LA 70802.

7

18.     Defendants Team Health Holdings, Inc. and Ameriteam own and control the system of affiliated entities operating as and collectively referred to herein as TeamHealth. TeamHealth itself is owned by a large private equity firm, Blackstone, which acquired the enterprise in 2017 for $6.1 billion. TeamHealth among other things provides ED staffing and administrative services to hospitals through a network of subsidiaries, affiliates, and independent contractors, which operate in nearly all states and which Defendants refer to as the "TeamHealth System."

19.     TeamHealth designed the complex structure of the TeamHealth System to circumvent state laws that prohibit general business corporations from practicing medicine, employing doctors, controlling doctors' medical decisions, or splitting professional fees with doctors, aka, the corporate practice of medicine.

20.     TeamHealth deploys numerous local subsidiaries and affiliates with varying names intentionally to efface its own involvement in the relevant practices, as is further discussed below.

## III.     JURISDICTION AND VENUE.

21.     This Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy for the Plaintiff exceeds $75,000, exclusive of interest and costs, and under 28 U.S.C. § 1332(d) of the Class Action Fairness Act (CAFA), because this is a class action in which at least one Plaintiff or class member is a citizen of a different State than at least one Defendant and the classwide amount in controversy is over $5,000,000.

22.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the claims arise under federal law, and under 18 U.S.C. § 1964(c) in that this action alleges

violations of RICO. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

23. This Court has personal jurisdiction over Defendants because they were located in or conducted relevant business activities in the State of Tennessee during the pertinent times or otherwise had such minimum contacts with the forum as to make it fair and reasonable for them to be hauled into Court here. All named Defendants except for ACS Primary Care Physicians Louisiana PC are also believed to do business specifically in Tennessee by staffing EDs in towns including Union City, Tazewell, Sevierville, Livingston, Carthage, Winchester, Pulaski, Lawrenceburg and Athens, Tennessee.

24. Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to this Complaint occurred in this District; and because the Defendants transact business in this District, including doing business with emergency room departments and hospitals in this District, and engaging in relevant coding and billing activities here.

## IV. <u>DETAILED FACTS.</u>

### a. <u>Background on TeamHealth.</u>

25. TeamHealth has entered into arrangements with numerous hospitals to replace local ED practice groups with TeamHealth's outsourced staff and attendant administrative, operational, coding and billing infrastructure. TeamHealth staffs those emergency departments with ED physicians, midlevel practitioners and other staff under contract with TeamHealth, and it bills payors for the services these staffers provide.

26. Midlevel practitioners, also called non-physician practitioners or advanced clinical practitioners ("ACPs") are health care workers who have a defined scope of practice. They

9

pertinently can include physician assistants ("PAs") and nurse practitioners ("NPs"). Midlevels have training less than a physician but greater than a nurse or medical assistant.

27.     TeamHealth organizes groups of local personnel to staff hospitals using locally formed business entities such as, here, ACS Primary Care Physicians Louisiana PC.  This local, small entity is reflected on paper as the employer of the TeamHealth-supplied ED staff at the relevant hospital visited by enrollees of the Plaintiff's plan.  In fact, though, the higher-level TeamHealth entities have domination and control over these local entities, such that the local entities function as mere instrumentalities for purposes of assigning joint and several liability to the parent entities.

28.     After TeamHealth's healthcare contractors provide a service to a patient, an administrative group at TeamHealth's centralized corporate offices creates a health insurance claim by converting the medical record of TeamHealth's healthcare contractors into a health insurance claim. TeamHealth sends the claim to applicable payors including insurers, third-party administrators ("TPA") of self-funded plans, CMS, or directly to the patient.

29.     Here, for the specific false claims and overbilling applicable to the named Plaintiff, the applicable local TeamHealth entity was ACS Primary Care Physicians Louisiana PC, a Louisiana-organized entity.  The TeamHealth staffers consisted of physicians, ACPs and/or others who were assigned to work in the emergency department of Rapides Regional Medical Center, located at 211 4th Street, Alexandria, LA 71301.

30.     TeamHealth characterizes its healthcare staff as independent contractors.  In reality, under TeamHealth's business model, they are on information and belief actually employees and servants of TeamHealth, because notwithstanding any contract terms purporting to expressly

designate the physician or ACP as an independent contractor, in fact under the reality of the TeamHealth relationship with its ED staff, TeamHealth closely supervises, controls and directs some or all of those staff in a manner reflecting a relevant right to control.[7]

31.     The TeamHealth staff who treat the patient do not see the insurance claims that TeamHealth creates, even though the claims are submitted in their names.  Nor do they receive the money that TeamHealth collects.  Rather, TeamHealth has the money sent directly to TeamHealth.  Generally, TeamHealth pays doctors and physician's assistants/midlevels a fixed hourly and/or per patient or per transaction fee.  Using this scheme, TeamHealth is able to keep most of the money that its doctors and midlevels generate.

32.     Under the normal course of billing and payment, payors do not see the medical records generated by TeamHealth's healthcare staff.  Instead, TeamHealth, on information and belief working through its subsidiary HCFS Health Care Financial Services, LLC, generally only sends medical billing codes and minimal other data, in electronic or hardcopy CMS-1500 form.  Payors typically accept the CPT codes as submitted and calibrate payments accordingly in a process which is often heavily automated and merely administrative, with no independent judgment exercised regarding whether the facially proper[8] CPT code is in fact inflated.  This information asymmetry is ripe for fraud, and TeamHealth has exploited it.

_____

[7] *E.g., Galloway v. Memphis Drum Service*, 822 S.W.2d 584, 587 (Tenn. 1991) (finding on the facts before the court that degree of control was inconsistent with an independent contractor relationship, an independent contractor being one who undertakes to produce a given result without being in any way controlled as to the methods by which he attains that result) (citing cases).
[8] The CPT codes used by TeamHealth superficially appear to be facially proper, in the sense that there is a small group of CPT codes used for emergency services, and the codes selected by TeamHealth for its billing fall into that group.  However, TeamHealth coders routinely select the wrong, inflated code out of that available code set.

11

33.     After TeamHealth convinces a hospital to "outsource" its ED to them, TeamHealth acts as an intermediary or gatekeeper between its own (directly or indirectly employed or contracted) healthcare workers, and the Medicare authorities, insurance companies and self-funded plans that pay for their services.  By acting as an intermediary, TeamHealth gets to bill for services performed by its healthcare staff, but without any oversight.

34.     TeamHealth's business model of being an intermediary between doctors and insurance companies causes doctors to be paid less. TeamHealth requires that all payments be sent directly to its corporate enterprise and keeps most of the payments. TeamHealth generally compensates its healthcare staffers at a fixed hourly or transactional rate that does not vary with the amount of excess payments TeamHealth extracts through its billing schemes.

35.     TeamHealth's individual healthcare contractors and employees have no say in how much TeamHealth bills for their services. TeamHealth is the controlling intermediary between its healthcare staffers, on the one hand, and healthcare payors, and patients, on the other.

36.     TeamHealth has grown dramatically by acquiring other staffing/billing companies focused on emergency services and other sectors. It has become one of the largest suppliers of outsourced healthcare staffing and administrative services for hospitals and other healthcare providers in the United States. TeamHealth operates nationwide, claiming to control hospital ER departments in 47 states, and employs more than 18,000 individuals.

37.     Historically, many or most hospital EDs have operated at a loss.  However, TeamHealth's business model has generated significant profits.

38.     When sending bills or providing services, TeamHealth usually does not use its own name or provider identification number (PIN); instead, it uses the names and PINs of its doctors

12

or one of its dozens of controlled entities who are the local affiliates, most of which do not carry the TeamHealth name. Because TeamHealth uses many different entities and names to carry out its billing scheme, it has been able to mask the enormity of its enterprise and the sheer number of times it has carried out this scheme. Here, as noted, the local entity name that TeamHealth used was ACS Primary Care Physicians Louisiana PC, which name TeamHealth used for billing in addition to other provider names it used.

39.     TeamHealth structures its business operations to support its profit-maximizing strategy while disguising its participation in the corporate practice of medicine. The corporate practice of medicine doctrine prohibits corporations from practicing medicine or employing a physician to provide professional medical services. This rule promotes doctors working for themselves or with other doctors. It is intended to safeguard against the commercialization of the practice of medicine which risks putting financial incentives above patient care.

40.     TeamHealth seeks to circumvent state laws banning the corporate practice of medicine by creating and maintaining a large number of these local-entity subsidiaries with various names. TeamHealth owns and operates a number of regional corporations, which in turn own these subsidiaries that employ physicians as purported independent contractors. TeamHealth, the corporation, thus avoids directly employing the doctors it controls.

41.     At its headquarters, TeamHealth handles all the medical coding and billing for work performed by its staffers around the country and uses uniform procedures across the enterprise designed to maximize revenue. It centrally controls its workforce nationwide by setting procedures for their work, for when and how much they work, and for what they are paid. TeamHealth decides what codes to assign and how much to bill for its personnel's services. When TeamHealth's

13

workers complete their work with a patient, they submit medical records to headquarters, where TeamHealth engages in upcoding, overbilling, and aggressively collecting on its bills.

42.     Medical coding is the process of converting a medical record into a billing code that accurately describes the medical service provided. Billing codes are used by CMS and private payors to pay for services. Standardized health care billing codes are called Current Procedural Terminology or CPT codes. TeamHealth determines what CPT codes to bill and sends claims containing these codes to payors when TeamHealth seeks payment for services.

43.     A central administrative group at TeamHealth's corporate offices in Tennessee (on information and belief, consisting of HCFS Health Care Financial Services, LLC) handles the coding. They take the medical records generated by TeamHealth's healthcare staffers and decide what CPT code to bill for the work performed.  After reviewing the medical record generated by the TeamHealth medical team staffing the hospital ED in question, a TeamHealth "coder" assigns the CPT codes. TeamHealth then submits the codes as a claim.

44.     TeamHealth's coders are administrative employees hired and trained by TeamHealth.  They are not ED physicians and usually lack medical training.  TeamHealth's doctors and midlevels do not see the codes selected by TeamHealth's coders, nor do those front-line workers see the insurance claim or billed amounts. They have no idea how TeamHealth bills their services even though the bills often are submitted in their names for services they rendered. The providers are not involved in assigning codes to the services they provide, and they are not consulted regarding what codes should be billed.

45.     One of TeamHealth's healthcare workers described the situation: "As an emergency medicine physician, I have absolutely no idea to whom or how much is billed in my

14

name. I have no idea what is collected in my name. This is not what I signed up for and this isn't what most other ER docs signed up for. I went into medicine to lessen suffering, but as I understand more clearly my role as an employee of TeamHealth, I realize that I'm unintentionally worsening some patients' suffering."[9]

46.     When seeking payment for services, TeamHealth may not provide actual medical records. Instead, it makes a representation that the CPT codes accurately describe the service provided by the TeamHealth unit at the hospital ED in question.  When TeamHealth does not include medical records showing what services were provided, a payor cannot compare the codes on the claims to documentation regarding the services.  Because of the large volume of claims submitted and the laws prohibiting health insurance fraud, payors reasonably rely on TeamHealth's representations.

47.     In accordance with its usual practice, during the pertinent times, TeamHealth submitted health insurance claims without including the underlying medical records, or otherwise with Defendants taking steps to conceal the true nature of the overbilling and render it more difficult to discern. Plaintiff and the class paid TeamHealth's claims in reliance on TeamHealth's representations.

48.     TeamHealth relies on a simple calculus:  that the effort it takes (one must hire a coding expert to do it) to manually go through the claims for payment and weed out the 50% or more[10] with overbilling via inflated CPT codes is inefficient if not cost-prohibitive as a process of

---

[9] *See* Isaac Arnsdorf, "How Rich Investors, Not Doctors, Profit From Marking Up ER Bills," ProPublica, June 12, 2020, https://www.propublica.org/article/how-rich-investors-not-doctors-profit-from-marking-up-er-bills (last accessed March 16, 2022).
[10] Compare the *United Healthcare* case, in which the plaintiff alleged 60% of examined claims were overbilled.  *See United Healthcare* complaint ¶ 8 ("The United Plaintiffs have reviewed tens

15

identifying and rectifying individual cases of the overbilling. However, large insurance company payors have used their large cohort of claims to engage in statistical analysis and determine the systematic nature of the overbilling.[11] And the federal government has performed a similar analysis with regard to Medicare claims.[12]

49. TeamHealth is able to conceal false information in its health insurance claims because (a) the healthcare staffer who provided the service does not see the health insurance claims that TeamHealth submits, (b) the patient who received the service does not see the health insurance claim that TeamHealth submits, and (c) TeamHealth typically does not provide complete records to payors. TeamHealth abuses this information asymmetry to perpetrate the fraud.

50. Every time TeamHealth submitted a health insurance claim to Plaintiff, it certified that the information was true, accurate, and complete and that the services listed were medically indicated and necessary to the health of the patient and were personally furnished. However, due to the improper scheme, often these certifications were false.

51. Ultimately, TeamHealth's billing schemes have harmed not only Plaintiff and self-funded plans generally but also, patients. Inflated health insurance claims increase cost-sharing obligations and drive up the cost of health care. TeamHealth's improper practices have not only

_____

of thousands of commercial health benefits claims submitted by TeamHealth and have determined that well over half of the claims TeamHealth submitted to United using the two highest level CPT codes for ER visits—roughly 60%—should have utilized lower-level CPT codes."). In *Celtic*, the expressed percentage was similar. *Celtic Ins. Co.*, 3:20-cv-00523-DCLC-HBG, Complaint ¶ 12 ("Similarly, one of Celtic's affiliates recently received and reviewed more than 10,000 of TeamHealth's medical records associated with health insurance claims that TeamHealth billed at the highest ER medical billing codes. Celtic's affiliate concluded that TeamHealth had 'upcoded' nearly two-thirds of the health insurance claims associated with those 10,000-plus medical records.").

[11] The *Celtic* case, *supra; United Healthcare; supra.*

[12] *United States ex rel. Hernandez, supra.*

16

increased costs for patients but have also put upward pressure on premiums that cause the federal and state governments to spend more on cost-sharing subsidies and other taxpayer-funded support.

       **b.**      **<u>Further detail regarding TeamHealth's scheme.</u>**

52.      During the relevant times, Plaintiff's enrollees in the self-funded plan have received ED medical care from one or more TeamHealth-supplied staff. Based on that care, TeamHealth submitted health insurance claims that Plaintiff paid in reliance on the medical billing codes submitted by TeamHealth. However, as Plaintiff has now confirmed with an expert, TeamHealth falsely inflated the medical billing codes on insurance claims that it submitted to Plaintiff.

53.      TeamHealth's upcoded health insurance claims caused Plaintiff to overpay TeamHealth for services performed by its doctors and physician's assistants or other midlevel providers. By upcoding, TeamHealth submitted fraudulent insurance claims, resulting in overpayments by Plaintiff that TeamHealth secured through fraud and through its enterprise consisting of a carefully constructed business structure operating across state lines.

54.      Like Medicaid and Medicare, private health insurance companies and TPA-administered self-funded plans pay less for services provided where the level of service only warrants a lower versus a higher CPT code.

55.      During the same period of time that TeamHealth sent bills with inflated CPT codes to Plaintiff which resulted in the Plaintiff paying TeamHealth, TeamHealth was also sending similar bills with similar inflated codes to other self-funded plans, to government payors, and to insurance company payors. TeamHealth's improper overbilling practices were discovered by one or more insurance companies and complained of in past and in ongoing litigation. *See* Complaint filed on December 10, 2020 in *Celtic Ins. Co. v. Team Health Holdings, Inc.*, No. 3:20-cv-00523-

17

DCLC-HBG (E.D. Tenn.) (alleging *inter alia* systematic upcoding/overbilling; matter was later resolved); Complaint filed on October 27, 2021 in *United Healthcare Services, Inc. v. Team Health Holdings, Inc*., No. 3:21-cv-00364-DCLC-JEM (E.D. Tenn.) (same, claim remains pending).

56.     The plaintiff in the *Celtic Ins. Co.* case alleged with factual specificity similar unlawful CPT upcoding during the same time period.  *See Celtic Ins. Co*., No. 3:20-cv-00523-DCLC-HBG, Complaint, Doc. 1, ¶¶ 1 (alleging that "[i]n the past seven years, TeamHealth billed over $100,000,000 in fraudulent health insurance claims to Affordable Care Act health insurance plans run by Celtic. TeamHealth perpetrated this billing fraud by "upcoding" tens of thousands of health insurance claims, then submitting the upcoded claims to Celtic under the names of thousands of unsuspecting doctors who work for TeamHealth"), 8-15 (alleging overbilling based on CT codes), 50-78 (same, with further detail), 90-117 (RICO claim).

57.     In the *Celtic Ins. Co.* litigation, Celtic alleged that TeamHealth systematically upcoded health insurance claims that TeamHealth billed at higher and more expensive CPT codes. Celtic determined that TeamHealth billed routine services that TeamHealth's healthcare contractors provided, at the highest medical billing codes, even when the patients required only straightforward and minimal treatment. For example, patients complaining of headaches, fevers, bug bites, and other relatively minor symptoms were upcoded resulting in health insurance claims billed at the most expensive billing codes.

58.     Likewise, the plaintiff in the *United Healthcare Services, Inc.* case alleged with factual specificity similar unlawful CPT upcoding during the same time period.  *See United Healthcare Services, Inc.,* No. 3:21-cv-00364-DCLC-JEM, Complaint, Doc. 1, ¶¶ 1 ("Since at least 2016, TeamHealth has covertly and methodically engaged in a classic form of healthcare

fraud called upcoding. Upcoding occurs when a healthcare provider submits a claim to an insurer or claim administrator utilizing a Current Procedural Terminology (CPT) code that misrepresents the services provided, thus using the code to deceive the insurer or claim administrator into overpaying. Here, TeamHealth has deliberately upcoded tens, if not hundreds, of thousands of claims to the United Plaintiffs for emergency room services, resulting in the United Plaintiffs overpaying TeamHealth by more than one hundred million dollars."), 55-72 (upcoding allegations, including discussion of CPT codes), 73-87 (alleging 13 specific examples of CPT upcoding), 211-227 (RICO claim).

59.     In the instant case, during the pertinent times, by making similar misrepresentations, TeamHealth submitted insurance claims resulting in overpayments by Plaintiff.   As a result of TeamHealth's upcoding, Plaintiff paid TeamHealth more than was warranted on claims. Had TeamHealth assigned billing codes that accurately reflected the services provided, Plaintiff would have paid less.

60.     Likewise, TeamHealth was sued for an analogous practice of upcoding standard ED services to "critical care" billing codes in a *qui tam* case; see Second Amended Complaint filed on September 19, 2019 at Doc. 83 in *United States ex rel. Hernandez v. Team Fin., LLC,* No. 2:16-CV-00432-JRG (E.D. Tex.).   The whistleblowers in that case alleged internal emails and presentations by TeamHealth executives encouraging employees to bill for critical care codes, as opposed to lower codes.  However, few situations meet the CMS definition for "critical care," and CMS requires individualized assessment of each presenting condition to see whether it fulfills the criteria for critical care.

61.     That court denied a motion to dismiss.  *United States ex rel. Hernandez*, 2020 U.S. Dist. LEXIS 26608, *9, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020) (describing the complaint allegations of "a classic upcoding scheme. Under the Critical Care Scheme, TeamHealth bills CMS for 'critical care'—the highest level of emergency treatment reserved for life-threatening situations—when in fact critical care services were not rendered and/or were not medically necessary, thereby submitting false claims through fraudulent billing.").  On June 25, 2021, the case was dismissed pursuant to a False Claims Act settlement agreement.  Docs. 438, 439.[13]

62.     Significantly in *Hernandez*, documents unearthed by a whistleblower reflected that TeamHealth maintained and enforced policies designed to inflate its bills for emergency services in similar contexts.  Per the insider documents, upper management at TeamHealth imposed quotas with respect to claims utilizing CPT codes 99291 and 99292—codes that denote increments of time spent rendering "critical care" to "critically ill or critically injured" patients.  These codes, along with the codes 99281 through 99285 at issue herein, make up the universe of ED billing codes.  The qui tam relator alleged that TeamHealth's policies require physicians to certify that treatment rendered met the criteria for CPT Codes 99291 and 99292, which are only appropriate in extreme circumstances, with respect to at least 6% of patients. This is far higher than the percentage of claims that may properly utilize these codes.  The whistleblower complaint stated

---

[13] Unusually for a False Claims Act settlement, the settlement in this case was filed without disclosure of the actual settlement amount, although it is clear an amount was paid.  *See* Doc. 438 in *Hernandez*, styled as a "Joint Notice of Payment and Motion for Dismissal," in which the parties recited that "Defendants stipulated that they would make the payments required by the Settlement Agreement on or before June 28, 2021. The purpose of this notice is to inform the Court that Defendants have completed the required payments…."  Subsequently, an intervenor moving in *Hernandez* for the unsealing of various materials noted that "TeamHealth paid a total of $48 million to the United States and Relators" but "did not, however, agree to change its practices." Doc. 442, p. 6.  As of the date of this filing, that motion to unseal materials remains pending.

20

further: "TeamHealth instructs its coders and billers (who follow those instructions) to code and submit claims to CMS for payment for critical care services based on medical records and documentation that TeamHealth knows do not establish that the services provided met CMS' criteria and payment conditions for 'critical care' services and, therefore, do not support claiming reimbursement for such services at CMS' elevated rate of reimbursement for true critical care services." *See Hernandez* Complaint, Doc. 1, ¶¶ 95-98, so alleging with citations. No. 3:21-cv-00364-DCLC-JEM, Doc. 1.

63. TeamHealth's inflated coding profits from the fact that many Americans use hospital EDs to address numerous concerns that do not present emergent situations. Based on recent surveys, patient volume in EDs has been growing faster than the population for decades. In 1997, annual visits to the ED totaled 94.9 million (35.6 per 100 people). By 2006, that total had increased 26 percent overall to 119.2 million, or 14 percent when adjusting for population growth (40.5 per 100 people). Then by 2015, ED visits had reached 136.9 million, or 43.3 per 100 people—a 7 percent increase from 2006 on a per capita basis.[14]

64. Furthermore, of those visits, a significant percentage of them involve a need for only "semiurgent" or "nonurgent" care. Of all ED visits, upwards of 30% or more do not involve immediate or emergent circumstances.[15] That reality gives TeamHealth ample opportunity to upcode and get paid as if most of its patients have life-threatening emergencies when in fact they often need only more routine medical services.

---

[14] *See* Tara O'Neill Hayes, Primer: Examining trends in emergency department utilization and costs, Nov. 1, 2018, available at https://www.americanactionforum.org (last accessed March 16, 2022) (citing sources).
[15] *See id.*

65.     As a result of TeamHealth's upcoding, Plaintiff has paid TeamHealth more than was warranted on claims. Had TeamHealth assigned billing codes that accurately reflected the services provided, Plaintiff and class members would have paid less.

66.     The Plaintiff plan performed a limited search of its records to seek to locate examples of TeamHealth bills received since 2018, i.e., within the last four years. The Plaintiff located eleven instances in which the following criteria were met by a submitted claim:

   a.   The claim was billed within the last four years (since 2018);

   b.   The billing provider was identified to be a local TeamHealth entity (in this case, Defendant ACS Primary Care Physicians Louisiana PC, which held the contract to provide ED staffing at Rapides Regional Medical Center, located in Alexandria, LA); and

   c.   The billing code was one of the standard CPT codes available in the case of emergency room services (as opposed to other kinds of care) (the applicable codes are 99281, 99282, 99283, 99284, 99285, 99291 and 99292).

67.     The facts for these specific examples[16] reflect that in nine out of the eleven claims, there was overbilling in the CPT coding. Specifically:

   a.   **Case No. 1**: ER Chart No. 2019W0007, DOS 1/23/19.[17] TeamHealth intentionally and fraudulently selected the improper CPT code of 99284. In fact, the claim should have only been coded at 99282. As to this file, and each of those itemized below, Defendant acted deliberately and with intent to defraud, and, with regard to each, Plaintiff has had the relevant file reviewed by a qualified medical coding expert. The expert determined that the proper CPT code for the claim in each instance should have been lower. In this instance, the CPT code should have been 99282. The facts reflect that the Defendants used that inflated CPT code to seek to justify its charge for case number 1. As to each of these itemized examples, the amount that was subsequently paid was inflated and improperly increased as a result or the Plaintiff was otherwise overcharged and damaged as a direct result of the overbilling. Furthermore, in each instance, as part of the overbilling process,

---

[16] Given the medically sensitive nature of the information, the Plaintiff will produce it in further detail following the entry of a HIPAA-qualified protective order.

[17] Plaintiff has adequately identified each claim in a manner that should let TeamHealth identify and retrieve data regarding the claim from its business records.

22

TeamHealth caused fraudulent billing statements to be directed to the Plaintiff across state lines. On information and belief, in each instance, the unlawful coding was performed by TeamHealth employees associated with the HCFS Health Care Financial Services, LLC entity; and TeamHealth sent across state lines electronic CPT codes embedded in the generic CMS-1500 forms sent to the Plaintiff.

b. **Case No. 2**: No. 2020W0030, DOS 3/16/20. TeamHealth coded this claim using CPT Code 99284. The matter should have been coded at CPT code 99283 [in shorthand form, 99284 / 99283].

c. **Case No. 3**: No. 2021W0084, DOS 2/16/21. 99284 / 99283.

d. **Case No. 4**: No. 2018W0103, DOS 6/15/18. 99284 / 99281.

e. **Case No. 5**: No. 2019W0144, DOS 10/28/20. 99284 / 99281.

f. **Case No. 6**: No. 2020W0010, DOS 2/15/20. 99284 / 99283.

g. **Case No. 7**: No. 2019W0219, DOS 8/22/19. 99285 / 99283.

h. **Case No. 8**: No. 2019W0069, DOS 5/15/19, 99285 / 99284.

i. **Case No. 9**: 2018W0007, DOS 1/16/18, 99284 / 99283.

j. **Case No. 10**: This claim was properly coded.

k. **Case No. 11**: This claim was properly coded.

68. In each of the above-listed claims, TeamHealth, near the time of the specified date of service, transmitted a bill across state lines to Plaintiff and/or Plaintiff's agent and/or representative, Risk Management, Inc., as an overt act, undertaken with a deliberate intent to deceive, as a part of Defendants' uniform improper billing and coding operations.

69. Each one of these bills included and reflected an unlawfully inflated charge amount based upon the above-alleged use of the wrong CPT code. This evidence thus reflects overbilling in 9 out of 11 claims (81%).

23

70.     The evidence of pattern and practice derived from the subject claims is corroborated by similar allegations and evidence adduced in one or more other pending or prior lawsuits brought against Team Health entities as alleged hereinabove.

        c.      **Additional facts regarding TeamHealth corporate structure.**

71.     By its dictionary definition, a "cartel" is "an association of manufacturers or suppliers with the purpose of maintaining prices at a high level and restricting competition."[18] Defendants' use of numerous separately incorporated physician group entities, under the circumstances, is cartel-like behavior.

72.     In this matter, there are numerous small regional and local medical and physician practices across the country.  Some are self-standing.  Others may be a part of networks.  Some may be branches of a single larger business.

73.     What is less well known is that numerous of what facially appear to be small separate independent physician practices, with differing NPI numbers,[19] that are spread throughout the country, are actually all members of the single ultimately commonly-owned and -operated TeamHealth enterprise following uniform rules and procedures and directing all of the medical billing from all of those practice groups go through a single bottleneck entity – HCFS Health Care Financial Services, LLC – as the point of interface between TeamHealth and its doctors on the one hand, and TeamHealth and its payors on the other.

---

[18] Google's English dictionary, provided by Oxford Languages.
[19] The National Provider Identifier (NPI) is a Health Insurance Portability and Accountability Act (HIPAA) Administrative Simplification Standard.  NPI numbers are a unique identification number for covered health care providers.  See www.CMS.gov.

24

74.     During the pertinent times, HCFS Health Care Financial Services, LLC coded and submitted claims to insurers and claims administrators pursuant to policies set by Team Health Holdings, Inc. and Ameriteam Services, LLC.  TeamHealth including through HCFS Health Care Financial Services, LLC employs a dedicated staff that prepares and submits insurance claims based on medical records received from physicians.  On information and belief, many of these individuals are not certified professional coders, but rather depend on TeamHealth for their training regarding the use of CPT codes.

75.     Medical coding requires training to identify the appropriate CPT codes to ensure appropriate and accurate billing.  Certified professional coders must undergo extensive training and certification to ensure that they make justified coding decisions.  The extent to which TeamHealth opts not to use certified professional coders corroborates TeamHealth's focus on maximization of revenue rather than compliance.

76.     The rate at which TeamHealth submitted claims to Plaintiff and to others under its pattern and practice of improperly utilizing higher CPT codes including 99284 and 99285 was significant to the point that TeamHealth's own failure to identify it, control and end it reflects intentional misconduct or recklessness on TeamHealth's part particularly in light of TeamHealth's copious representations and assurances of ethical and legal compliance and close control over its coders made on its website.

77.     TeamHealth's error rate for relevant categories of claims greatly exceeded any acceptable error rate for providers of emergency services for such claims. The degree to which claims obviously warranted lower CPT codes upon review forecloses the possibility that the upcoding occurred by mistake.  The degree and consistency of TeamHealth's upcoding of claims

utilizing CPT codes 99284 and 99285 demonstrates that TeamHealth has a uniform policy or practice of upcoding such claims.

78.     During the pertinent times, TeamHealth used the coding and billing services of HCFS Health Care Financial Services, LLC as a recruiting tool with physicians. TeamHealth marketed the entity publicly as follows, encouraging physicians to rely on its asserted coding and billing expertise, and indicating that this would grow revenue:

> With today's tightening regulations, striking a balance between maintaining compliance and <u>appropriately charging for your health care services has become an arduous task</u>. Poor documentation of your patient records may not only mean lost revenue—it places your practice in danger of fines or worse. The complex nature of emergency medicine only serves to complicate matters even further.
>
> As an integral part of <u>our billing services, HCFS of TeamHealth provides expert medical coding performed by seasoned, trained professionals</u>. By staying abreast of state and federal guidelines as well as third-party payer coding rules, <u>we help you reduce revenue loss</u> while remaining compliant. HCFS of TeamHealth also offers regular workshops designed to help educate your providers and improve their documentation skills.
>
> From teaching you and your colleagues how to properly document patient encounters to <u>correctly coding each medical record and performing random audits</u>, we are dedicated to helping you bridge the gap between compliance <u>and revenue</u>.

(Emphasis added).

79.     Based on those and similar representations that were made orally and by other means to them, practicing TeamHealth doctors and nurses at TeamHealth-staffed emergency rooms justifiably relied on TeamHealth to properly and lawfully provide all billing, coding and compliance services.

80.     TeamHealth's coding and billing entity exists to serve as the centralized coding and billing point for all TeamHealth's numerous local physician practices that it indirectly but

26

Case 3:22-cv-00104-DCLC-JEM    Document 1    Filed 03/21/22    Page 26 of 46
PageID #: 26

ultimately owns, in addition to any services the entity provides to non-Team Health medical providers with regard to their billing and coding needs.

81.    In marketing itself as having special expertise in billing and coding, TeamHealth acknowledges that it involves special knowledge and expertise for an individual professional coder to go through and determine or check on the CPT code for a particular claim. TeamHealth exploits the combined facts that a) automated claims processing depends on CPT codes being accurate and pays levels based on codes, and b) automated processes do not "go behind" CPT codes to review supporting documentation by having an expert manually check whether in fact the medical records justify the assigned level of CPT coding.

82.    For some self-funded plan administrators, the process is automated. *United States ex rel. Hernandez*, No. 2:16-CV-00432-JRG, Complaint ¶ 34. Because it is automated, the computer system depends blindly upon the electronic CPT code embedded in the generic Form CMS-1500 which is processed and paid by an automated means with little human involvement. TeamHealth banks on this system to conceal the fraud caused by the overbilling via inflated CPT codes.

83.    In summary, the above-referenced set of nominally separately incorporated, standalone and independent physician provider entities, including ACS Primary Care Physicians Louisiana PC herein, which are ultimately owned by TeamHealth, are actually, under the accepted definition, a cartel, in the sense that they are organized so as to extract higher revenues (via overbilling) as a unitary enterprise.

84.    In fact, this group of entities dissolves upon examination from presenting as a group of separate physician practices spread around the country and associated with particular hospital

EDs, into being in reality and in the eyes of the law a single and a unitary enterprise, all under the auspices of the ultimate parent company, Team Health Holdings, Inc.[20]

85.     TeamHealth recruits doctors and ACPs by promising to lift the administrative burden of being a practicing professional off their shoulders.[21]  The natural desire of physicians is generally to provide the care to the patients and fulfill their Hippocratic Oath, not to learn how to correctly code and bill Medicare or other payors.

86.     TeamHealth promises to doctors to provide great expertise and skill in all aspects of medical practice coding, billing, collections, and compliance.  With regard to billing, the HCFS Health Care Financial Services, LLC website promises medical providers and provider groups that it will not only take over all their billing but also, will make them more money than otherwise:

> Through our full-service revenue cycle management services, HCFS of TeamHealth helps you ease your administrative burden, speed reimbursement and keep days in accounts receivable well below average. We also provide expert guidance designed to help you gain more control over your managed care contracts and <u>optimize your revenue</u>.
>
> Our Comprehensive Billing Services Include:
> *     Helping you set an appropriate fee schedule
> *     Evaluating your existing managed care contracts for efficiency
> *     Negotiating <u>favorable payment rates with managed care payers</u>
> *     Correctly enrolling your physicians and mid-level providers with third-party payers
> *     Performing daily audits to account for all of your billable patient charts
> *     <u>Correctly coding all billable medical records</u>
> *     Maintaining stringent HIPAA and coding compliance
> *     <u>Collecting deductibles and co-payments from your patients, including "self-pay" patients</u>

---

[20] It is for this reason, for example, that Team Health Holdings, Inc. previously litigated, and settled, the federal government overbilling qui tam matter as the one of the named defendants therein.  *See Hernandez*, No. 2:16-cv-00432-JRG (E.D. Tex.), Doc. 33, first amended complaint.

[21] See website, https://www.teamhealth.com/what-we-do/emergency-medicine/?r=1, professing how doctors associating with TeamHealth will receive the benefit of TeamHealth "increasing your administrative support."

28

- <u>Getting your insurance claims and patient bills and statements out quickly and accurately, using electronic delivery whenever possible</u>
- Researching and handling all refunds
- Correctly depositing funds into your group's bank account
- Providing a National Patient Service Center to manage billing inquiries from your patients and payers

**Our Diligent Collections[22] Process**

HCFS of TeamHealth has put together dedicated claims denial teams that respond quickly when your claims are denied, underpaid or ignored. HCFS of TeamHealth billing centers utilize advanced technologies such as electronic skip tracing and electronic insurance verification systems to locate hard-to-find patients and identify insurance coverage more quickly in the revenue cycle.

**Let Our Experience Work for You**

Boasting the largest emergency physician billing operation in the United States, HCFS of TeamHealth submits approximately 7 million insurance claims and processes invoices for more than 8.6 million patients annually on behalf of our clients. Our billing services are backed by expertise, support and advanced technologies. <u>Many of our clients experience a dramatic increase in their income as a result of utilizing our services.</u>

(Emphasis added). Thus, TeamHealth markets a unitary set of billing and collection practices engaged in by "HCFS of TeamHealth billing centers."

87. Finally, with regard to compliance, the website touts that TeamHealth has "expertise in medical coding guidelines," uses "a rigorous, standards-based coding methodology," engages in "[r]outinely auditing each coding staff member's work on pre-billed records," so that clients can reach the goal of "optimizing growth and stemming revenue loss."

88. The polarity as between TeamHealth and its doctors is reflected by the fact that in multiple class actions its own doctors have sued alleging that TeamHealth had failed to share with

---

[22] Rather than write off amounts owed by low-income patients like other providers, TeamHealth has filed lawsuits. On information and belief, TeamHealth filed 4,800 lawsuits in Tennessee between 2017 and 2019 alone.

29

them certain patient billing revenues known as resident value units ("RVUs"). That litigation led

to a classwide order of preliminary approval dated in the matter of *Forward Momentum, LLC v.*

*Team Health, Inc*., No. 2:17-cv-00346-WKW-JTA (N.D. Ala. March 11, 2022).[23]

89.     Here, the Plaintiff brings no claims against the TeamHealth physicians or ACPs.

Rather, Plaintiff recognizes the fact that the physicians and ACPs who are out practicing in the

field at the various TeamHealth-staffed hospital ED locations, are effectively removed, insulated

and siloed away from all matters related to billing and coding including the material facts and

transactions herein.

## V.     CLASS ACTION ALLEGATIONS.

90.     Plaintiff brings this action on behalf of itself and all others similarly situated under

Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2) and (b)(3), as well as Rule 23(c)(4) in the

alternative, as representative of a class defined as follows:  **All self-funded plans and payors that**

**compensated TeamHealth or an entity billing on its behalf for medical treatment in the**

**United States or its territories during the four years[24] prior to the filing of the Complaint in**

**this action.**

---

[23] (order preliminarily approving a settlement in the amount of $15 million; this constituted a fund
to pay back the doctors some of the RVU monies); *see also Sanchez v. Team Health, LLC*, No. 18-
21174-CIV-MARTINEZ-OTAZO-REYES, 2021 U.S. Dist. LEXIS 64213, 2021 WL 4990803
(S.D. Fla. March 31, 2021) (in which plaintiff TeamHealth doctors sued TeamHealth alleging the
company was not sharing RVU relative value unit payments with its doctors; in this order, the
court dismissed the claims in part); *JMF Med., LLC v. Team Health, LLC,* 490 F. Supp. 3d 947
(M.D. La. Sept. 29, 2020) (similar resident value unit RVU allegations).
[24] The alleging of this damages period is not intended to waive Plaintiff's right to contend that to
the extent any limitations periods may apply to the Plaintiff's' claims, those limitations periods
were tolled during the period before the Plaintiff uncovered the revelations regarding systematic
upcoding. Until that point, Plaintiff lacked knowledge of the fact that TeamHealth had deliberately
and systematically deceived them by sending inflated claims for emergency room services.

91.    Members of the class are so numerous and geographically dispersed that joinder of all is impracticable. TeamHealth enters into agreements with and bills services to numerous self-funded plans throughout the nation and in conjunction with those medical coverage plans provides medical services to numerous patients each year in hospitals across the country. Thus, joinder of all members is clearly impracticable.  Numerosity is apparent.[25]

92.    The class is readily identifiable from information and records in the possession of TeamHealth.  Further, Plaintiff's claims are typical of the claims of the members of the class.  Plaintiff and all members of the class were damaged by the same wrongful conduct, i.e., Plaintiff and all members of the class had enrollees who received treatment from a TeamHealth staffer and were billed artificially inflated prices for the services received.

93.    Plaintiff will fairly and adequately protect and represent the interests of the class.  The interests of Plaintiff are coincident with, and not antagonistic to, those of the other members of the class.  Class counsel representing Plaintiff are experienced in class action litigation.

94.    Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members, here as in other analogous matters in

---

[25] "According to the data, among all firms the percentage of employees covered by self-funded plans had increased from 44 percent in 1999 to a record high of 67 percent in 2020 before decreasing slightly to 64 percent in 2021. Self-funded plans are those in which companies choose to pay for some or all of the health services of their workers directly rather than purchasing health insurance for them."  Statistica website, at https://www.statista.com/statistics/985324/self-funded-health-insurance-covered-workers/ (last accessed March 17, 2022).  Further, "[i]n recent years, a complex funding option, often called level-funding, has become more widely available to small employers. Level-funded arrangements are nominally self-funded options that package together a self-funded plan with extensive stoploss coverage that significantly reduces the risk retained by the employer. Sixteen percent of covered workers in small firms (3-199 workers) are in a level-funded plan."  Kaiser Family Foundation, https://www.kff.org/report-section/ehbs-2020-section-10-plan-funding/ (last accessed March 21, 2022).

31

which self-funded plans made up a putative class.[26] Further, TeamHealth has acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate or supporting the remedy of injunctive and equitable relief.

95.    Questions of law and fact common to the class include, but are not limited to:

    a.  Whether TeamHealth engaged in one or more systematic and uniform unlawful schemes or courses of conduct by "upcoding" and billing prices above lawful and proper amounts and rates;

    b.  Whether TeamHealth, during the pertinent times, sent inflated bills for services to Plaintiff and class members;

    c.  Whether the TeamHealth enterprise acted under a common purpose of profiting from inflated billing;

    d.  Whether TeamHealth engaged in a pattern and practice of deceptive or fraudulent activity intended to defraud or deceive Plaintiff and class members;

    e.  Whether the various TeamHealth Defendants are jointly and severally liable due to their own direct involvement or under the instrumentality rule;

    f.  Whether the TeamHealth enterprise and its unlawful upcoding and other practices constituted an "enterprise" under RICO;

    g.  Whether TeamHealth violated RICO;

    h.  Whether TeamHealth is liable to plaintiffs and the class members for damages flowing from Defendants' misconduct, under RICO;

    i.  Whether Plaintiff and class members have conferred benefits on TeamHealth such that they are entitled to restitution for payments above the quantum meruit value of TeamHealth's services, under a claim for unjust enrichment; and

    j.  Whether equitable, declaratory or injunctive relief is warranted.

---

[26] *See, e.g., In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-cv-20000-RDP (N.D. Ala.), preliminary approval order, Doc. 2641 filed Nov. 30, 2020, p. 57 (certifying *inter alia* class of self-funded plans in antitrust action).

32

96.     Plaintiff and members of the class have all suffered, and will continue to suffer, harm and damages as a result of TeamHealth's unlawful and wrongful conduct.

97.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly situated and commonly affected self-funded plans to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

98.     Certification of an opt-out class effectuated via the sending and publication of a duly authorized class notice may be optimal in this case given the likelihood that some of the putative class members may have already had their individual claims effectively resolved by virtue of resolutions of relevant actions or by non-public settlements, or who may individually already actively be pursuing such claims now, and therefore, who may desire to opt out.[27]

99.     The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be

---

[27] In its case, United Healthcare has alleged *inter alia* that some self-funded plans have hired it to be the plan administrator and gave United Healthcare in their contracts the right to bring claims against others to try to recover funds for the benefit of the plan. No. 3:21-cv-00364-DCLC-JEM, Complaint, Doc. 1, ¶¶ 27-28, 31, 40. For those self-funded plans, United Healthcare is attempting to "put a stop to TeamHealth's inequitable conduct, and to recoup the amounts TeamHealth obtained through its scheme from the United Plaintiffs and the plan sponsors of the United Plaintiffs' ERISA plans." *Id*. at ¶ 13. Should United Healthcare recover, this may moot damages for those specified members of the class. Alternatively, those plans may desire to opt out of a certified class because they are being made whole by virtue of the resolution of the *United Healthcare* matter if that occurs. In the present action, Plaintiff seeks to represent a class of self-funded plans, including but not limited to the interlocal plan herein. While some plans may have the benefit of large plan administrators like United Healthcare, who may already have pursued or recovered under claims against TeamHealth, there are numerous other self-funded plans that are smaller or otherwise more vulnerable to the fraud and with less code-audit resources to verify the legitimacy of the CPT codes.

33

pursued individually, substantially outweigh potential difficulties in management of this action. Absent a class action, most members of the class likely would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

100.    Additionally, TeamHealth has acted and failed to act on grounds generally applicable to Plaintiff and the class and that in the Court's discretion would warrant imposition of uniform relief to ensure compatible standards of conduct toward the class are met, thereby making equitable relief to the class as a whole within the meaning of Rules 23(b)(1) and (b)(2) an appropriate remedy.

101.    Alternatively, Plaintiff is entitled under Rule 23(c)(4) to the certification of a class with respect to one or more particular issues herein.

102.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### RACKETEER INFLUENCED AND CORRUPT
### ORGANIZATIONS ACT

103.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 102 as if fully set forth herein.

104.    RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct

34

or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

105.    RICO also provides: "Any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"

106.    Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) & 1964(c).

107.    Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

108.    Defendants' relevant activities herein significantly affected interstate commerce. With regard to the specific 11 examples of false claims alleged hereinabove, during the pertinent times the Defendants engaged in interstate commerce activities including but not limited to the performance of services by TeamHealth staff personnel at the relevant hospital ED in Louisiana; transmittal of records and data from Louisiana to TeamHealth offices including in Knoxville, Tennessee; performance of coding and billing activities by HCFS Health Care Financial Services, LLC; and transmittal of bills from TeamHealth to the Plaintiff or its agents.

109.    A RICO "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

110.    For purposes of this Complaint, the relevant enterprise is an association in fact, consisting of: (a) TeamHealth; (b) TeamHealth's direct regional subsidiaries; and (c) the individual corporations and other legal entities that employ and/or contract with the healthcare contractors or

35

employees whose services TeamHealth sells, and which TeamHealth either indirectly owns through its regional subsidiaries or controls de facto.

111.    Defendants have an existence separate and distinct from the TeamHealth enterprise, in addition to directly participating in and acting as a part of the enterprise. For example, TeamHealth markets HCFS Health Care Financial Services, LLC to provide coding and billing services as a vendor to third parties, in addition to its work on behalf of Team Health-controlled local physician and midlevel provider groups stationed at numerous hospital EDs.

112.    Although the various components of the enterprise play different roles, they all serve a common purpose: allowing TeamHealth to submit upcoded health insurance claims to insurers, and to keep the difference between the amount received as a result of the upcoded claim, and the amount that would have been received had the claim been properly coded.

113.    The front-line healthcare workers employed as employees or as independent contractors by the TeamHealth enterprise's corporate subsidiaries or de facto controlled affiliates provide medical services to patients in emergency rooms, aka, hospital EDs.

114.    TeamHealth's numerous subsidiaries and affiliates have a mixture of corporate ownership structures. Some of TeamHealth's affiliates are wholly owned by TeamHealth; others are partially owned by TeamHealth; and some are wholly owned by others.

115.    Without these corporations and the healthcare contractors who provide services, the enterprise would have nothing to upcode. The enterprise's regional subsidiaries oversee the entities employing or contracting with healthcare contractors, and they negotiate contracts with hospitals as conduits of the enterprise. Without the regional subsidiaries and the hospitals through which subsidiaries deploy their healthcare workers, the enterprise's healthcare workers would have

36

no patients to service, and TeamHealth's ability to efficiently coordinate and direct the activities of the entities employing the healthcare workers would be diminished.

116.     TeamHealth coordinates the entire enterprise; performs the upcoding; employs the staff that receives medical records from TeamHealth's healthcare staffers stationed at various EDs; and applies CPT codes to those records in accordance with policies dictated by TeamHealth.

117.     Each participant in the TeamHealth enterprise played a distinct and indispensable role, and the participants joined as a group to execute the scheme and further the enterprise's goals. Team Health Holdings and Ameriteam Services set policies requiring or encouraging the falsification of claims as explained hereinabove.  HCFS Health Care Financial Services carried out those policies by systematically submitting false and misleading claims to Plaintiff and class members for ED services. The various medical groups affiliated with TeamHealth supplied medical services to provide the basis for upcoded claims, here, through the local Louisiana-organized entity, ACS Primary Care Physicians Louisiana PC.

118.     The organization of the enterprise, and specifically its use of subsidiaries and purported independent contractors rather than direct employment of healthcare contractors, facilitates the enterprise's upcoding scheme in two ways.

119.     First, if TeamHealth directly employed all the healthcare workers controlled by it, or if it directly owned all the corporate practice groups that provide services on its behalf, TeamHealth would violate various state laws prohibiting the corporate practice of medicine.  The enterprise's structure is therefore essential to its functioning and to its ability to control and profit from healthcare providers who, at the same time, appear to patients, the public, and to unwitting bill recipients to be independent.

37

120.    Second, by operating through subsidiaries and other entities that have other names, TeamHealth creates an impression that patients have received services from a local doctors' group, as opposed to a sophisticated national enterprise that has repeatedly been sued for billing abuse among other practices.

121.    To this end, TeamHealth almost never bills patients or insurance companies under its own name. This creates the illusion that its healthcare physicians and midlevels are providing care that is locally owned and directed. This illusion disguises the truth and makes TeamHealth's fraud more difficult to detect, because TeamHealth submits upcoded and inflated health insurance claims under the names of dozens of different corporate entities, with no indication that they are affiliated with TeamHealth.

122.    This illusion helps protect TeamHealth politically and to insulate its activities, including by avoiding public scrutiny of the numerous claims it has made and lawsuits it has filed under various corporate names against individuals and insurance companies in efforts to collect on inflated bills.

123.    As the topmost corporate entity of what it calls the "TeamHealth system," TeamHealth conducts and directs the TeamHealth enterprise and sets policies that govern the functioning of all components of the enterprise. TeamHealth is responsible for the actual upcoding, which occurs after its healthcare contractors submit medical records that document the actual services provided to the patient. TeamHealth uses those medical records and improperly exaggerates the services they reflect, consistent with TeamHealth's procedures, in order to submit "upcoded" health insurance claims to insurance companies and other payors.

38

124.    RICO prohibits the conduct of an enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  Racketeering acts are defined at 18 U.S.C. § 1961(1) and include mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

125.    TeamHealth, through its enterprise, has committed numerous acts of mail fraud and wire fraud. Specifically, TeamHealth has conducted a scheme to defraud insurers and self-funded plans with specific intent to obtain money from them by materially false and fraudulent representations, and to use the mails and interstate wires in furtherance of the scheme, including via its medical billing practices.

126.    Central to TeamHealth's scheme to defraud is the systematic upcoding of medical services provided to insured patients by healthcare contractors that are under TeamHealth's control. TeamHealth's upcoding scheme misrepresents the nature of the services provided to Plaintiff's enrollees, for the purpose of recovering more money from Plaintiff and patients.

127.    Because payors like Plaintiff are generally not provided with the underlying medical records that form the basis of TeamHealth's health insurance claims, and because of the massive volume of health insurance claims, in the normal course of business, they rely on TeamHealth's representations regarding the nature of the services.

128.    TeamHealth's scheme has been carried out with the specific intent to defraud Plaintiff and others who are similarly situated. The evidence indicates that TeamHealth has submitted a large proportion of health insurance claims to Plaintiff and others who are similarly situated under the highest CPT codes for services by its healthcare contractors, improperly thereby rendering those claims false.

39

129. Instances of upcoding in TeamHealth's health insurance claims are not mere isolated incidents, but instead are part of a pattern and practice of upcoding intended to increase TeamHealth's revenue and profits.

130. The fact that TeamHealth's coding is conducted at a centralized location, under the oversight of TeamHealth management, further demonstrates that TeamHealth's numerous upcoded health insurance claims are not a matter of mere coincidence.

131. TeamHealth has used the mails and interstate wires in furtherance of its upcoding scheme to defraud Plaintiff and others who are similarly situated in a number of ways, including:

    a. Mail and wire receipt of medical records sent from TeamHealth-affiliated hospital ED groups located throughout the country to TeamHealth's centralized coding operations facility in Tennessee;

    b. Mail and wire transmission of fraudulently upcoded health insurance claims from TeamHealth's Tennessee offices to self-funded plans, including Plaintiff and class members, in numerous states throughout the country;

    c. Mail and wire transmission of marketing materials to hospitals in order to sell TeamHealth's staffing services and expand the scope of the enterprise;

    d. Mail and wire receipt of money from Plaintiff, and class members embracing other TPAs and self-funded plans, in various states, representing the unlawful proceeds of TeamHealth's upcoding scheme; and

    e. Mail and wire communications between TeamHealth and its regional subsidiaries and provider groups in various states, by which TeamHealth promulgates policies and procedures and directs conduct with a goal of maximizing billing.

132. TeamHealth's repeated acts of racketeering activity form a "pattern" under RICO because they occurred within ten years of each other, were continuous, and are related. Through its many mailings and wire communications in furtherance of its scheme to defraud, TeamHealth has committed numerous acts of racketeering activity.

40

133.    These acts are part of a common scheme and have the same purpose: to extract greater payments from payors than TeamHealth is entitled to.

134.    TeamHealth has adopted policies encouraging upcoding, and has a regular staff dedicated to coding that is trained to adhere to TeamHealth's practice of upcoding on a systematic basis. Upcoding is part of TeamHealth's regular way of doing business, and absent judicial intervention, TeamHealth will continue its upcoding scheme for as long as it remains profitable.

135.    Each participant in the enterprise, and in particular Team Health Holdings, Ameriteam Services, and HCFS Health Care Financial Services, knew their scheme violated federal and state laws, and acted with the specific intent to defraud the Plaintiff and other payors.

136.    The enterprise engaged in and affected interstate commerce because, among other things, it operated emergency rooms nationwide in to support its scheme, accounting for 17% of the emergency services market in the United States.

137.    Predicate acts of racketeering that Team Health Holdings, Ameriteam Services, and HCFS Health Care Financial Services engaged in include, but are not limited to: (a) the use of wires and mails to submit fraudulent claims to Plaintiff and other payors; (b) the use of wires and mails to coordinate the unlawful activities of the enterprise, including the dissemination of relevant policies and the transmission of medical records from medical groups to coding staff; and (c) the use of the wires and mails to obtain payments from Plaintiff, and to distribute the proceeds of the scheme amongst its members. Plaintiff has above alleged specific and representative examples of the fraudulent insurance claims the enterprise submitted to Plaintiff using the wires and mails.

138.    TeamHealth's upcoding scheme has directly caused injury to Plaintiff's business and property. Plaintiff suffers injury each time the plan pays a health insurance claim in reliance

on TeamHealth's coding, where the CPT code on that claim does not accurately represent the service actually provided.

139.     Plaintiff's injury and damages consists of the difference between the amount that Plaintiff paid TeamHealth on upcoded health insurance claims and the amount that Plaintiff would have paid had the underlying medical services had been properly coded and billed.

140.     By virtue of these violations of 18 U.S.C. § 1962(c), and pursuant to 18 U.S.C. § 1964(c), TeamHealth is liable to Plaintiff for three times the damage Plaintiff has sustained, plus the cost of bringing this suit, including reasonable attorneys' fees.

141.     Plaintiff also seeks equitable and injunctive relief including to require TeamHealth prospectively to alter its current policies that require, encourage and incentivize upcoding, retrain its coding staff to properly code medical records rather than systematically upcode them during billing, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth. Absent such an injunction, TeamHealth's upcoding is likely to continue.

## COUNT II
## CONSPIRACY TO VIOLATE RICO

142.     Plaintiff incorporates by reference the allegations in each of the preceding paragraphs 1 through 141 as if fully set forth herein.

143.     Defendants, collectively referred to as TeamHealth, agreed with each other to pursue the schemes described above, namely, upcoding and falsely billing services provided by physician's assistants as though they were performed by a doctor, with the ultimate objective of realizing increased revenue and profits. Although Plaintiff only learned of this conspiracy recently, it began years ago.

42

144.     Each of Defendants took overt acts in furtherance of the conspiracy, namely, promulgating policies that required TeamHealth employee responsible for coding insurance claims to upcode those claims; shielding the upcoding conduct from visibility to TeamHealth's own physicians and midlevel providers; aggressively billing payors on the inflated claims; and aggressively engaging in collection and litigation on its bills.

145.     Defendants knew that their policies would lead to a pattern and practice of submitting false and inflated claims to Plaintiff and others similarly situated, for the purpose of obtaining money from those payors by inciting them to rely on and pay based on materially false and fraudulent representations, all through the use of the mail and interstate wire transmittals within the meaning of RICO, in furtherance of the scheme.

146.     TeamHealth's upcoding scheme has directly caused injury to Plaintiff, who suffers injury each time the Plan pays a health insurance claim in reliance on TeamHealth's coding, where the CPT code on that claim does not accurately represent the service actually provided.

147.     Plaintiff's damages consist of the difference between the amount that they actually paid TeamHealth on each upcoded health insurance claim and the amount that they would have paid if the underlying medical services had been properly coded and paid.

148.     By virtue of these violations of 18 U.S.C. § 1962(c), and pursuant to 18 U.S.C. § 1964(c), TeamHealth is liable to Plaintiff for three times the damage that Plaintiff and the class sustained, plus the cost of bringing this suit, including reasonable attorneys' fees.

149.     Plaintiff also seeks equitable and injunctive relief requiring TeamHealth to alter its current policies incentivizing upcoding, retrain its coding staff to properly code medical records rather than systematically upcode medical records, and submit to a regular audit of its coding

43

Case 3:22-cv-00104-DCLC-JEM     Document 1     Filed 03/21/22     Page 43 of 46
PageID #: 43

practices by an independent monitor, with all costs to be paid by TeamHealth. Absent such an injunction, TeamHealth's upcoding is likely to continue.

**COUNT III**
**UNJUST ENRICHMENT**

150.    Plaintiff incorporates by reference the allegations in each of the preceding paragraphs 1 through 149 as if fully set forth herein.

151.    Plaintiff has repeatedly conferred benefits on TeamHealth, namely, in the form of making payments for services purportedly rendered by TeamHealth to Plaintiff's health care coverage enrollees.

152.    During the pertinent times, TeamHealth received and appreciated those benefits; it was aware that Plaintiff was making payments to it for services purportedly rendered.

153.    Retention of these conferred benefits by TeamHealth without adequate compensation would be unjust and inequitable under the circumstances, because the amount of the payment materially exceeded the value of the service for which the billing was sent, namely, provision of medical services to Plaintiff's enrollees.

154.    Plaintiff is not in contractual privity with TeamHealth. There is therefore no means for Plaintiff to secure contractual recovery of the benefits they have conferred on TeamHealth. Any attempt to seek recovery of Plaintiff's losses from the parties with whom Plaintiff is in contractual privity, i.e., Plaintiff's enrollees, would be unjust because enrollees who seek treatment in emergency rooms have little control over which ED doctor they see and have no control over how their claims are coded, and neither the patients nor the hospitals receive the overpayment that TeamHealth extracted from Plaintiff via its coding schemes.

44

155. Furthermore, all similarly situated class member payors are likewise entitled to restitution or damages as a result of TeamHealth's unjust enrichment.

### DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial of all issues properly triable by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that the Court grant the following relief:

1. Certify the matter as a class action;

2. Appoint Plaintiff as the class representative and appoint the undersigned counsel to be class co-counsel herein;

3. Enter judgment in favor of Plaintiff on all counts of this Complaint;

4. Award Plaintiff and class members money damages, in an amount to be proven at trial, of at least $5,000,000, including but not limited to any applicable award of treble damages pursuant to RICO, 18 U.S.C. § 1965(c), or as otherwise permitted by law;

5. Enter equitable and injunctive relief requiring TeamHealth to alter its current policies regarding upcoding, retrain its coding staff to properly code medical claims rather than systematically upcode medical claims, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth;

6. Award Plaintiff and class members their costs, expenses, and reasonable attorneys' fees incurred in this action as permitted by law;

7. Award Plaintiff and class members all pre- and post-judgment interest to the maximum extent permitted by law; and

8. Award such other relief as this Court deems just and proper.

45

Dated:  March 21, 2022.

                                s/Mary A. Parker

                                Mary Parker #06016
                                Parker & Crofford
                                5115 Maryland Way
                                Brentwood, TN 37027
                                615-244-2445 Tel
                                615-255-6037 Fax
                                mparker@parker-crofford.com

Mona L. Wallace (N.C. Bar No. 09021)*
John S. Hughes (N.C. Bar No. 22126)*
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
mwallace@wallacegraham.com
jhughes@wallacegraham.com

Janet Varnell, Esq.*
Florida Bar No. 0071072
VARNELL AND WARWICK, P.A.
1101 E. Cumberland Ave.
Suite 201H, #105
Tampa FL 33602
Tel.: (352) 753-8600
jvarnell@vandwlaw.com

Andrew A. Lemmon*
(LA Bar #18302)
LEMMON LAW FIRM, LLC
Of counsel to Milberg, Coleman, Bryson, Phillips, Grossman,
PLLC
PO Box 904 (mailing address)
15058 River Road
Hahnville, LA 70057
Tel.: 985-783-6789
andrew@lemmonlawfirm.com
alemmon@milberg.com

*pro hac motion to come.

*Attorneys for Plaintiff*

46